IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LOUIS MICHAEL MANN, BG-2742,  )
    Petitioner,  )
                       )
       v.  )   2:14-cv-394
                       )
NANCY GIROUX, et al.,  )

MEMORANDUM OPINION and ORDER

Mitchell, M.J.:

    Louis Michael Mann, an inmate at the State Correctional Institution at Albion has presented a petition for a writ of habeas corpus. For the reasons set forth below, the petition will be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability will be denied.

    Mann is presently serving a twenty to forty year period of imprisonment following his conviction, by a jury, of third degree murder and criminal conspiracy at No. CP-02-CR-9922-2005 in the Court of Common Pleas of Allegheny County, Pennsylvania. This sentence was imposed on May 16, 2007.[1]

    An appeal was taken to the Superior Court in which the issues presented were:

I.     When the Commonwealth has no actual new evidence and has offered no reasons for why it waited nearly nine years to charge Mr. Mann and when crucial evidence was lost or destroyed during those nine long years, does this unjustified pre-arrest delay violate Mr. Mann's constitutional rights to due process and to present a defense?

II.     Is a defendant entitled to an instruction on involuntary manslaughter when the evidence shows that the cause of death was "pressure on the neck" and that the decedent was carried ninety feet by his neck, which could have been found by a properly-instructed jury to be reckless or grossly negligent conduct?

III.     When a prison inmate dies while locked in his cell and the defendants have no access to him when he died, did the Commonwealth prove with sufficient evidence the identity of the person who killed him.[2]

---

[1] See: Petition at ¶¶ 1-6.
[2] See: Exhibit 14 to the answer at p.111.

On October 19, 2009, the judgment of sentence was affirmed.[3]

On January 22, 2010, a petition for allowance of appeal to the Pennsylvania Supreme Court was filed in which the issue presented was:

   I.   Should this Court grant allowance of appeal to grant appellate review of a murder conviction that was affirmed due to a mistake by the Superior Court?[4]

On June 23, 2010 leave to appeal was denied.[5]

On July 16, 2010, Mann submitted a post-conviction petition which was dismissed on February 27, 2010.[6]

An appeal was filed in the Superior Court in which the issues presented were:

1. Did the trial court err in denying appellant's PCRA petition since trial counsel Foreman was ineffective for not responding in closing argument to the testimonial and photographic evidence regarding a cut on appellant's finger, and for not obtaining an expert to rebut the Commonwealth's inference that the cut was occasioned during an assault upon the victim. Appellant also requested, in the PCRA petition, the funds ($2,000) for the appointment of an expert, and the trial court erred in failing to grant same?

2. Did the trial court err in denying appellant's PCRA petition since trial counsel was ineffective for failing to call Donald Rusch to testify at appellant's January 2007 jury trial?

3. Did the trial court err in denying appellant's PCRA petition since appellant possessed newly discovered evidence, in the form of an affidavit from George Tobin that revealed information that would have caused a different verdict at his jury trial?

4. Did the trial court err in denying appellant's PCRA petition since trial counsel was ineffective for failing to call John Laskaris to testify at appellant's jury trial, and Mr. Laskaris also presented an affidavit with newly discovered evidence that would have resulted in an acquittal for appellant if it had been presented to the jury?

5. Did the trial court err in denying appellant's petition since appellant possessed newly discovered evidence, in the form of an affidavit from Nuno H. Pontes,

---

[3] See: Exhibit 16 to the answer at pp.212-231.
[4] See: Exhibit 20 to the answer at p.255.
[5] See: Exhibit 22 to the answer at p.331.
[6] See: Exhibits 23 and 27 at p.414 to the answer.

that revealed information that would have caused a different verdict at his jury trial?

6. Did the trial court err in denying appellant's PCRA petition since trial counsel was ineffective for coercing appellant not to testify at his jury trial, after appellant "demanded" to testify, especially to explain the origin of the cut on his finger?[7]

On November 7, 2012, the denial of post-conviction relief was affirmed.[8] Leave to appeal to the Pennsylvania Supreme Court was denied on May 15, 2013.[9]

In the instant petition, executed on March 24, 2014, Mann contends he is entitled to relief on the following grounds:

I. The state court's decision that no prejudice resulted from the nine year delay in prosecution is contrary to or an unreasonable application of clearly established federal law.

II. The state court's decision that the trial court did not commit plain error when it refused to give jury charge to a lesser offense is contrary to or an unreasonable application of clearly established federal law.

III. The state court's decision that the verdict did not violate petitioner's constitutional right is contrary to or involved an unreasonable application of clearly established federal law.

IV. Was petitioner denied due process of law and the right to a speedy trial?

V. Was petitioner denied due process of law when trial counsel failed to properly prepare for trial thereby permitting the introduction of improper evidence?

VI. Was petitioner denied due process of law when trial counsel failed to object to instances of prosecutorial misconduct?

VII. Was petitioner denied due process of law when trial counsel failed to object to instances of plain error?

VIII. Was petitioner denied due process of law by trial counsel's failure to present evidence?

---

[7] See: Exhibit 31 to the answer at pp. 430-431.
[8] See: Exhibit 33 to the answer at pp.511-533.
[9] See: Exhibit 37 to the answer at p.604.

3

The background to this prosecution is set forth in the November 7, 2012 Memorandum of the Superior Court citing the trial court's opinion:

> In 1996, Richard A. Guy was an inmate at Western Penitentiary serving a life sentence for murder and testified as follows. At that time, the institution was very overcrowded and in a state of disarray. The facility was the dumping ground for the Department of Corrections to take all the hard cases and incorrigible inmates the other facilities couldn't handle. Western Penitentiary was a very violent place, and security was so lax that inmates were essentially in charge of the institution. Sexual and physical assaults were prevalent, there was rampant drug use, and prisoners brewed their own alcohol.
>
> Guy described the prison routine as follows. The prisoners were released from their cells for breakfast between 6:00 a.m. and 7:00 a.m. They returned to their cells at 9:00 p.m., when the cells were closed for the night. While some guards left the gates between units opened continuously, normally the gates were closed and then re-opened for five to ten minutes at the top of each hour so that the inmates could move among prison units. This procedure was known as "line movement." A "head count" occurred at noon, 6:00 p.m., and 9:00 p.m. between head counts, inmates were free to run around and do whatever you wanted to do. They could go to the prison yard, hang out on the tiers, and take showers.
>
> Inmates earned money through jobs, and the primary employment consisted of making license plates for the Commonwealth, which lasted from 8:00 a.m. until 10:30 a.m. and then again from 1:00 p.m. to 3:00 p.m. All the inmates became aware of the patrol routine of the various prison guards, who were "creatures of habit."
>
> In September, 1996 Guy and Boris were housed together in cell 409. Appellant and DeBlase resided in cell number 420, and Carlos Vasquez lived in cell number 410 with Adam Colon. Boris, who was aided by Guy, was adept at making homemade wine and was known at Western Penitentiary for making the best wine in jail, which he sold.
>
> At approximately 2:00 p.m. on September 10, 1996, Guy and Boris completed a batch of wine and sold it. Approximately two to three hours later, Guy saw Boris, who was a heroin user, purchase that drug from Colon and Vasquez. From 6:00 p.m. to 8:00 p.m., Guy, who was very intoxicated from drinking the wine, did not see Boris because Guy first went to a class and then made several calls from the telephones, which were located outside. Since each inmate had a personal identification number that they were required to enter in order to place a telephone call, the Commonwealth produced documentary support that Guy, using the identification number assigned to him, made calls from a prison telephone from 7:05 p.m. to 7:55 p.m. on September 10, 1996.

After Guy's final telephone call that evening, Appellant and DeBlase approached Guy, and DeBlase told Guy that Boris was "all f---ed up" and that Guy needed to "come look at Boris right away." On the way to the cell,[Appellant and DeBlase] told Guy that Boris had overdosed on some heroin, they had tried to revive him and done a few things to help him out, and he was up there in bed. Appellant and DeBlase wanted Guy to check and see how Boris was doing and told Guy that "they had walked him around and put a bag of ice under his testicles, which is what they do in overdose cases with heroin and stuff."

When he arrived at his cell, Guy observed Boris with his head on its side lying on his stomach in his bunk. Guy glanced quickly at the victim, who appeared to be asleep. Guy, as noted, was intoxicated and had more or less accepted Appellant and DeBlase's word of what had happened. Guy therefore assumed that Boris was basically sleeping the heroin off. At that point, Colon offered some heroin to Guy, who took the drug and fell asleep.

Guy awoke at 4:00 a.m. on September 11, 1996, and asked Boris if the head count had occurred at 9:00 p.m. the previous night. There was no response, and at that point, Guy look over, and he noticed that there was something seriously wrong with [Boris]. Boris was unresponsive, and bloated and purple. He also was very stiff and cold. Guy informed the prison guard that Boris was dead, was handcuffed, and was immediately taken to the isolation unit, which the prisoners referred to as the "hole." Later that day, Guy was asked to give a urine sample to be tested for drugs, but he was unable to urinate due to his ingestion of heroin.

***

Since he was a suspect in Boris's death, Guy remained in the isolation unit. Appellant, DeBlase, Colon, and Vasquez were later transported to the "hole." About four to five weeks after September 11, 1996, Appellant and Guy came in contact with each other in a special yard for inmates in the isolation unit. Appellant told Guy what actually happened to Boris. Guy testified, "The only thing [Appellant] really said along those lines is that there had been a tussle between them and things had gotten out of hand."

Vasquez testified at trial as follows. In 1996, he was in prison at Western Penitentiary for murder. He and Colon, who sold heroin, became cellmates because they were both Hispanic and could speak Spanish together, and they roomed in the cell next to Guy and Boris. Vasquez's prison job was to clean the second tier of the cellblock, and he performed that task at approximately 3:30 p.m. each afternoon.

Sometime during the early afternoon of September 10, 1996, Vasquez heard Boris tell Colon that he wanted some heroin. At approximately 3:30 p.m., as Vasquez was leaving to perform his job on the second tier, he passed the cell of Appellant and DeBlase and saw Colon inside. Vasquez's attention was drawn to the cell

5

because he heard an "argument," and as he passed by, Vasquez saw a "person" who was not Colon fall down inside the cell. Vasquez ignored the incident and went about his business to work the second tier.

When Vasquez returned to the fourth tier after performing his job, he observed Appellant and DeBlase carrying Boris's body toward Boris's cell. Vasquez stated that Appellant had him by the neck, and DeBlase was carrying Boris by the legs. Boris had his pants down to his knees. You could see his anus and everything. Vasquez said to Appellant and DeBlase, "What did you all do, rape him or something?" and then, "[T]hat is messed up." Vasquez testified that Boris appeared to be "dead" because he was not breathing.

Vasquez then returned to his cell. He saw Colon give heroin to Guy later that evening and used heroin himself that night. The following day, urine tests were given to all the inmates who were being investigated in connection with the death. Vasquez also stated that when he, Appellant, and DeBlase were in the isolation unit's yard during the ensuing investigation, Appellant said that since Guy was unconscious from using heroin, "he doesn't remember anything about the incident, let's try to pin it on him."

In 1996, Commonwealth witness Arthur Dixon was jailed at Western Penitentiary serving a sentence for robbery and he was housed in cell 414 with his brother, Tyrone Williams. Dixon also had a cleaning job at the prison, and at approximately 3:00 p.m. on September 10, 1996, he saw Appellant, DeBlase, and the victim "arguing." At approximately 5:00 p.m., Boris told Dixon that the argument was about the fact that DeBlase had given Boris drugs, and after Boris had sold the drugs to another inmate, that inmate had died from taking them.

After the 5:00 p.m. conversation with Boris, Dixon went into the shower area and saw that DeBlase, who was sitting on a toilet, had Boris in a choke hold. Dixon continued, "[Boris] was sitting on [a] stool with his back to [DeBlase]. And [Appellant] was standing in front of [Boris] punching him in his face and body." Dixon left and returned to his cell. About fifteen minutes later, Appellant and DeBlase came to Dixon's cell, and asked Dixon and Williams to help them carry Boris. Dixon and his brother refused to get involved in the matter and locked their cell door.

After approximately [fifteen to twenty minutes], Dixon observed Appellant and DeBlase carrying Boris's body back to his cell; Boris had blood coming out of his ear and his eyes were wide open. Dixon also saw Boris's body lying in the bottom bunk bed about one-half hour before the 9:00 p.m. head count. He had a blanket over a portion of his body and his face was on its side.

Adam Colon also was a Commonwealth witness. He was incarcerated for murder and was serving a life sentence when Boris was killed. He confirmed that his cellmate in 1996 was Carlos Vasquez, that Colon sold heroin in prison, and that

6

Boris made wine and used heroin. On the evening of the murder, Colon was with Boris, DeBlase, and Appellant, and they all were using heroin and drinking wine in the cell where Appellant and DeBlase were housed. Boris, DeBlase, and Appellant were speaking loudly, and Colon saw DeBlase hit Boris in the chest with a broomstick. Colon left the cell and went to his own cell. Later, DeBlase came and asked Colon to help him carry Boris to his cell. Colon testified that he refused and then he saw Appellant and DeBlase carrying Boris to his cell.

Forensic pathologist Abdulrezzak Shakir conducted the autopsy. [Boris's] blood alcohol content was .21% and he also had morphine, which is the substance found in the blood of individuals who have used heroin, in his system. [Boris] had sustained external trauma around the time of his death. There were abrasions and bruising on his face and along his back. In addition, there was an abrasion on the left side of the neck and a contusion on the right side of the neck. Boris's eyes showed evidence of hemorrhage, which is an escape of blood from its vessel. In Boris's case, the eye hemorrhaging was caused by pressure being placed on [his] neck or chest such that the pressure obstructed the blood vessels that pump blood from the head and caused the blood to leak into the eyes. There was also a hemorrhage on the left side of the larynx and one of the neck muscles, which indicated evidence that the pressure leading to the eye hemorrhage had been placed on the neck by strangulation.

Dr. Shakir concluded that the heroin and wine in [Boris's] system contributed to his death in two ways. First, it rendered him unable to "resist" the pressure being applied to his neck, and second, it interfered with his ability to breath. Dr. Shakir stated that Boris died sometime between 6:00 p.m. on September 10, 1996 and 12:00- a.m. on September 11, 1996. The witness opined that the "cause of death of Mr. Boris was asphyxiation due to strangulation, and I put the heroin and the alcohol intoxication as contributory causes of death."

Based on this evidence, Appellant was convicted of third degree murder and conspiracy, and after the Commonwealth withdrew its position that Appellant was subject to a mandatory minimum sentence due to his commission of prior crimes of violence, sentencing proceeded under the guidelines. Appellant received a standard range sentence of ten to twenty years [of] imprisonment on each conviction. The sentences were imposed consecutively for a total term of imprisonment of twenty to forty years.[10]

The first issue is whether or not the petition has been timely filed. 28 U.S.C. §2244(d). From the above factual history it is apparent that the petition is timely, and the Commonwealth concedes as much.[11]

The next issue is exhaustion. It is provided in 28 U.S.C. §2254(b) that:

---

[10] See: Exhibit 33 to the answer at pages 511-516.
[11] See: Answer at p.19.

> An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

This statute represents a codification of the well-established concept which requires that before a federal court will review any allegations raised by a state prisoner, those allegations must first be presented to that state's highest court for consideration. Preiser v. Rodriguez, 411 U.S. 475 (1973); Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973); Doctor v. Walters, 96 F.3d 675 (3d Cir. 1996).

It is only when a petitioner has demonstrated that the available corrective process would be ineffective or futile that the exhaustion requirement will not be imposed. Preiser v. Rodriguez, supra.; Walker v. Vaughn, 53 F.3d 609 (3d Cir. 1995).

If it appears that there are available state court remedies, the court must determine whether a procedural default has occurred. If a procedural default has occurred, the court must determine whether cause or prejudice exists for the default, or whether a fundamental miscarriage of justice would result from a failure to consider the claims. Carter v. Vaughn, 62 F.3d 591 (3d Cir. 1995).

In construing § 2254(d)(1), the Court in Williams v. Taylor, 529 U.S. 362, 412-413 (2000) stated:

> Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied - the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from this Court's decisions but
unreasonably applies that principle to the facts of the prisoner's case.
We must thus decide whether the state supreme court's "adjudication of the claim
... resulted in a decision that was *contrary to*, or involved *an unreasonable
application* of, clearly established Federal law, as determined by the Supreme
Court of the United States...

A state court adjudication is "contrary to" Supreme Court precedent if it results
from the application of "a rule that contradicts the governing law set forth" by the
Supreme Court or is inconsistent with Supreme Court decision in a case involving
"materially indistinguishable" facts ... "A state court decision fails the
'unreasonable application' prong only 'if the court identifies the correct governing
rule from the Supreme Court's cases but unreasonably applies it to the facts of the
particular case or if the state court either unreasonably extends a legal principle
from the Supreme court's precedent to a new context where it should not apply or
unreasonably refuses to extend the principle to a new context where it should
apply...(citations omitted).

That is, the state court determination must be objectively unreasonable. Renico v. Lett, 130 S.Ct. 1855 (2010).

Mann's first issue is that he suffered prejudice as a result of the nine year delay in filing the criminal charges. In United States v. Marion, 404 U.S. 307, 324 (1971), the Court held that:

The Government concedes that the Due Process Clause of the Fifth Amendment
would require dismissal of the indictment if it were shown at trial that the pre-
indictment delay …caused substantial prejudice to appellees' rights to a fair trial
and that the delay was an intentional device to gain tactical advantage over the
accused.

A hearing was conducted on July 31, 2006 to consider the pre-trial delay issue and specifically to determine whether there was any evidence in existence in 2006 which was not available in 1996.[12] While there was no such additional physical evidence, the prosecution did not occur because in 1996 no one was willing to testify against the petitioner and his codefendant (PT 7/31/06 at pp.58, 64, 65). At the conclusion of that hearing, the trial court concluded,

It's a difficult question as to whether there's actual prejudice here. The Court does
not find an intent to deprive defendants of their Constitutional rights. The issue
I've heard bears greatly upon the credibility, weight of the evidence offered by the
Commonwealth, but it does not rise to the kind of prejudice that would require the
Court to dismiss the prosecution. (PT 7/31/06 at p.72).

---

[12] The major focus of this hearing concerned negative urine reports from specimens collected at the time of the events in question which involved several anticipated prosecution witnesses.

9

Accordingly, the prosecution went forward.

Initially we note that the findings of the trial court are entitled to a presumption of correctness. 28 U.S.C. §2254(e)(1); Burt v Titlow, 134 S.Ct. 10 (2013). Mann argues that as a result of the delay, the "lost" institutional records would have demonstrated that he was at his prison job at the time prosecution witness Dixon testified petitioner was involved in a confrontation with the victim. (TT.01/29/07 p.250). In addition, Dixon also testified that he had previously written a letter about the incident in which he did not mention the petitioner (TT. 01/29/07 p.254) thus creating a credibility issue for resolution by the fact-finder. As the Superior Court observed prosecution witness Dixon's time frame was clearly mistaken in that the coroner had testified that death occurred after 6 p.m., at which time the petitioner was not working, and not during the period between 9:00 a.m. and 10:00 a.m. at which time the petitioner contended that the "lost" records would have demonstrated he was at work.[13]

Despite Mann's allegations that the "lost" evidence would have proven that he could not have committed the crime between 9:00 a.m. and 10:00 a.m., no prejudice resulted since the crime occurred many hours later. For this reason, the record supports the trial court's conclusion that no prejudice resulted from the delay in filing the charges is presumed correct here.

Petitioner's next argument is that he is entitled to relief as a result of a refusal by the trial court to instruct the jury on the lesser offense of involuntary manslaughter. It is provided in 18 Pa.C.S.A. §2504(a) that:

> A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person.

This issue was raised in petitioner's direct appeal and for this reason is properly raised here. In addressing this issue, the Superior Court adopted the findings of the trial court[14] which held:

> The evidence presented … even when viewed in a light favorable to the defendant, did not tend to show that the defendant was not guilty of murder but guilty of involuntary manslaughter. The evidence tended to show that the defendant and DeBlase killed the victim through the intentional act of strangling him. The co-defendant was seen choking the victim while the defendant struck

---
[13] See: Exhibit 16 to the answer at p.225.
[14] See: Exhibit 16 to the answer at p.231.

him. Minutes later, he was seen carrying an apparently dead victim back to the victim's cell. There was no evidence tending to show that the killing of the victim was the result of reckless or grossly negligent conduct by the defendant. Though defense counsel, when requesting the charge on involuntary manslaughter, suggested that **perhaps** the defendant died accidentally as the defendant and DeBlase were carrying him back to his cell after he passed out; that the strangulation happened because they were carrying him by his neck, there was no evidence offered to support that theory (emphasis in original).[15]

Since this matter was determined as a matter of state law, it is not subject to review here. Swarthout v, Cooke, 131 S.Ct. 859 (2011).

Mann's third argument is that the verdict violated his rights. In essence, he argues that the evidence was insufficient to support his conviction.[16] In a challenge to the sufficiency of the evidence, the question presented is whether based on the evidence any rational fact-finder could have determined guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-319 (1979).

Pennsylvania designates third degree murder as all murders which are not intentional i.e., willful, deliberate or premeditated or occurred during the perpetration of an enumerated felony. 18 Pa.C.S.A. §2502. From the factual recitation set forth above, it is clear that the evidence was more than sufficient to permit a rational fact-finder to render a third degree murder conviction. For this reason, this claim does not present a basis for relief here.

Petitioner's fourth argument is that he was denied a speedy trial. Specifically in this regard he alleges that PCRA counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness for not raising a speedy trial issue. Although not raised in the state courts, in Martinez v. Ryan, 132 S.Ct.1309 (2012), the Court held that the failure of post-conviction counsel to raise an ineffectiveness of trial counsel claim was not procedurally barred from being considered by a federal court.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court explained that there are two components to demonstrating a violation of the right to the effective assistance of counsel. First, the petitioner must show that counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness." Id. at 688; see also Williams v. Taylor, 529 U.S. 362, 390-

---

[15] See: Exhibit 12 to the answer at pp. 89-90.
[16] See: Brief in support of petition at p.52.

11

91 (2000). Second, under Strickland, the defendant must show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The Strickland test is conjunctive and a habeas petitioner must establish both the deficiency in performance prong and the prejudice prong. See Strickland, 466 U.S. at 687; Rainey v. Varner, 603 F.3d 189,197 (3d Cir.2010) cert. denied 131 S.Ct. 1673 (2011). As a result, if a petitioner fails on either prong, he loses. Rolan v. Vaughn, 445 F.3d 671 (3d Cir.2006). In addition, federal courts must be "doubly deferential" to state court determinations of the adequacy of counsel. Burt v. Titlow, 134 S.Ct. 10 (2013).

In Barker v. Wingo, 407 U.S. 514 (1972), the Court examined the Sixth Amendment right to a speedy trial and concluded that in reviewing such a claim, a court must look to the length of the delay, the reasons for the delay, the defendant's assertion of his right to a speedy trial, and the prejudice, if any, suffered as a result of any delay. While the crime charged occurred in 1996, it was only after evidence emerged in 2005 linking the petitioner to the crime that the prosecution was initiated. Sequentially, the criminal complaint was filed and petitioner was arrested on June 14, 2005; an information was filed on July 20, 2005 and it was listed for trial on September 12, 2005[17]; on September 9, 2005, petitioner's motion for a continuance was granted and trial was rescheduled for March 13, 2006[18]; on the latter date petitioner again requested a continuance for more time to investigate and trial was relisted for July 31, 2006[19]; at a pretrial hearing held that date, counsel moved for a dismissal of the charges on grounds of delay in initiating the prosecution, that motion was denied and the case was rescheduled to August 14, 2006 at which time the Commonwealth moved for a continuance because "six Commonwealth witnesses will be out of state on the scheduled trial date" and the trial was continued to January 28, 2007[20] at which time it commenced.

---

[17] See: Exhibit 1 to the answer.
[18] See: Exhibit 37 to the answer at p. 605.
[19] See: Exhibit 39 to the answer at p.606.
[20] See: Exhibit 40 to the answer at p.607.

12

In considering the Barker elements, it is clear that petitioner was charged on June 14, 2005. At the request of the petitioner trial was continued or postponed until August 14, 2006 at which time the Commonwealth requested additional time to secure the appearance of witnesses who were out of state, and trial commenced on January 28, 2007. Thus, much of the delay was engendered by the petitioner and only five months is attributable to the Commonwealth. In addition, there is no showing of any prejudice to the petitioner as a result of the delay. Accordingly, counsel cannot be deemed to have been ineffective for failing to raise a meritless argument Real v. Shannon, 600 F.3d 302 (3d Cir.2010). For this reason the ineffective counsel claim as it relates to the denial of speedy trial does not present a basis for relief.

Mann's fifth argument is that counsel was ineffective for failing to object to prosecutorial misconduct. Specifically, it is alleged that without objection the prosecution withheld favorable evidence i.e. DNA samples taken from under the victim's fingernails; that the prosecution introduced hearsay evidence through Richard Guy regarding prison practices and that the prosecutor improperly argued to the jury about witness Dixon's testimony. These matters were not raised in the post-conviction proceedings and are procedurally defaulted here, Coleman v. Thompson, 501 U.S. 722 (1991). Nevertheless, Mann attempts to introduce them for the first time as an ineffective post-conviction counsel claim. Martinez, supra.

Brady v. Maryland, 373 U.S. 83 (1963) requires that the prosecution produce evidence favorable to a defendant on the issue of guilt or innocence. The burden rests on a defendant to demonstrate that the suppressed evidence would tend to undermine the verdict. Kyles v. Whitley, 514 U.S. 419 (1995). At trial a representative of the Allegheny County Medical Examiner's office was called as a witness by the prosecution and testified that the DNA discovered under the fingernails of the victim did not match that of either the petitioner or his co-defendant. (TT. 1/29/07 pp. 458-460). Clearly, this favorable evidence was not suppressed and no Brady violation occurred. Therefore, counsel could not have been ineffective in failing to raise this issue.

Petitioner next contends that counsel was ineffective for failing to object to the testimony of Richard Guy. Specifically, at trial Guy was asked to describe life at Western Penitentiary (TT. 1/29/07 p.70). In addition to testifying about the deplorable conditions, he also testified that it was a breeding ground for crime, drug use, alcohol manufacture and abuse (TT.1/29/07 p.76-77).

Petitioner now alleges that counsel was ineffective for failing to object to this "inflammatory" testimony. Clearly, this testimony was elicited for the purpose of explaining the setting in which the homicide occurred, and as such counsel cannot be deemed ineffective for failing to object.

Mann next argues that prosecutorial misconduct occurred during closing argument. During the trial prosecution witness Arthur Dixon testified that the morning after the homicide he wrote a letter regarding what he had observed (TT. 1/29/07 pp.267-270). Subsequently, during his testimony Trooper Bishop testified that he did not become aware of that letter until about November 1, 2004 (TT. 1/29/07 pp.399-400). During his closing argument, the prosecutor argued about the incompetent handling of the investigation by the investigator including the apparent unavailability of the Dixon letter until several years after it was authored (TT. 1/29/07 pp. 585-586). Petitioner now contends that this argument was an improper comment on the investigation and designed to inflame the jury.

Prosecutorial comments only provide a basis for relief when they so infect the trial as to create a due process violation. <u>Parker v. Matthews</u>, 132 S.Ct. 2148 (2012). In the instant case, the prosecutor merely condemned the original investigator as a result of the inexplicable unavailability of Dixon's letter for a period of years.[21] While strongly worded this closing was an attempt to explain the inexplicable, and did not interject prejudice. As such a due process violation did not occur.

The petitioner's sixth argument addresses alleged trial and post-conviction court errors and biases. Specifically, he contends that the trial court erred in denying him portions of the Department of Corrections records in violation of <u>Brady</u>; that the trial court acted partially when it did not require the Commonwealth to show cause for the nine year prosecution delay; that the trial court violated his speedy trial rights by granting the prosecution's request for a five month trial delay; that the trial court erred in permitting the introduction of the Dixon letter when at an earlier hearing, the investigative officer had contended that there were no letters in the investigative file; that the trial court erred in not permitting a view of the crime scene; that the trial court erred in permitting Dixon to present hearsay evidence and the trial court repeatedly interfered with the cross-examination of witness Dixon.

---

[21] "I do not know whether [the investigator] is stupid or lazy. In my career I have never seen an investigation that was so bungled from the beginning … these letters from Tyrone and Arthur[Dixon]… were in the homicide file, in the box for God knows how many years. Well, I didn't see them, I never got them. Lazy, inept, I don't know what, but [the investigator] didn't do her job…" (TT. 1/29/07 pp. 585-586).

14

These issues were not raised in the appellate courts of the Commonwealth and for this reason are procedurally defaulted here. Coleman, supra. In addition, many of these matters have been raised in other contexts and addressed herein.

Petitioner's next claim is that he was denied due process as a result of trial counsel's failure to object to certain evidence. While this issue was never presented in the state courts and for this reason is procedurally defaulted, Mann attempts to circumvent the exhaustion requirement by alleging that post-conviction counsel was ineffective for failing to raise these claims as a basis for alleging the ineffective assistance of trial counsel. Martinez, supra.

Specifically, he contends that counsel was ineffective for failing to call John Laskaris and Donald Rusch as defense witnesses. In his "affidavit" Laskaris merely recites statements allegedly made to him by Guy which are clearly hearsay, and in his affidavit Donald Rusch states that he was sitting in the yard with petitioner when Guy stated that he believed his cellmate had overdosed.[22] While Mann may believe these witnesses would have materially aided his case, it is clear that the medical examiner testified as to the cause of death, i.e. strangulation as well as the fact that the victim had heroin and alcohol in his system and these facts could in no way be challenged by the lay testimony of either Rusch or Laskaris. These claims were determined by the Superior Court to be meritless and these non-issues do not provide a basis for relief here.[23]

The petitioner's final argument was that counsel was ineffective for failing to call a rebuttal forensic expert to testify as to the cause of the victim's death. At trial the medical examiner testified that the victim's death was due to strangulation (TT.1/29/07 pp. 473-482), and the only contributing factor relating to his substance abuse was that it might have prevented him from resisting the assault and contributed to his respiratory depression but that death was the result of strangulation (TT.1/29/07 p. 482-483, 485). The medical examiner also testified that it is difficult to pinpoint with any degree of accuracy the exact time of death in such a case since different bodies react differently, and that the best he could do was present a range of time within which the death occurred (TT.1/29/07 p.483-484). There is no showing made here that presenting any additional forensic evidence would have been of value, and counsel cannot be deemed to have been ineffective for failing to raise a meritless claim. Real v. Shannon, supra.

---

[22] Appendix to the petition at Exhibits 24 and 25.
[23] See: Exhibit 33 to the answer at pp.524-526, 528-529.

15

Because none of the claims raised by the petitioner demonstrate that his conviction was secured in any manner contrary to federal law as determined by the United States Supreme Court nor involved an improper application of that law, his petition for a writ of habeas corpus will be dismissed and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability will be denied.

An appropriate Order will be entered.

ORDER

AND NOW, this 20th day of May, 2014 for the reasons set forth in the foregoing Memorandum, the petition of Louis Michael Mann for a writ of habeas corpus (ECF 1) is DISMISSED, and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability is DENIED.

s/ Robert C. Mitchell  
United States Magistrate Judge